IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

|  |  |  |
|---|---|---|
| RAMONA JOYNER | ) | |
| | ) | Case No. 4:12-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY | ) | By: Jackson L. Kiser, |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

Before me is Defendant's Motion for Summary Judgment [ECF No. 51], which was filed on November 30, 2012. Plaintiff filed a Response in Opposition to Defendant's Motion [ECF No. 60] on January 31, 2013, and Defendant followed by filing their Response in Support of Summary Judgment [ECF No. 65] on February 14, 2013. On February 25, 2013, I heard oral argument from both sides outlining their respective positions on the law, the facts, and the nature and extent of the record. Having thoroughly reviewed the briefs, the record, and the arguments of counsel, the matter is now ripe for decision. For the reasons stated below, I hereby **GRANT** Defendant's Motion for Summary Judgment.

## I.     STATEMENT OF FACTS

This case arises from the allegedly wrongful cancellation of Plaintiff Ramona Joyner's ("Plaintiff") long-term disability ("LTD") benefits by Defendant Hartford, incorrectly sued herein as Continental Casualty Company ("Defendant").[1] On August 26, 2011, Plaintiff filed a

---

[1] Continental Casualty Company ("Continental") was the original owner/insurer of Plaintiff's plan. During their ownership, Continental entered into a reinsurance agreement with CNA Group Life Assurance Company ("CNA"), which provided that CNA would administer the plan. As the administrator, CNA was appointed to perform claim adjustment services for the policies, including reviewing all claims to determine whether the

Complaint under the Employee Retirement Income Security Act ("ERISA") seeking reinstatement of Plaintiff's LTD benefits under her employee welfare benefit plan ("plan"), which is sponsored by her former employer, Computer Sciences Corporation ("CSC"). Defendant provided Plaintiff with LTD benefits under the plan from August 19, 2005 to January 30, 2010. On January 30, 2010, however, Defendant concluded that Plaintiff was no longer "disabled" under the terms of the plan and stopped providing benefits. Plaintiff's medical history and Defendant's internal decision-making process are detailed below.

### A. Plaintiff's Work History and Initial Application for LTD Benefits

In 2000, Plaintiff medically retired from the U.S. Army at the age of thirty-five due to depression and fibromyalgia. (See Def.'s Mot. for Sum. J., Ex. B., pg. 53.) On October 7, 2002, Plaintiff started working at CSC and subsequently enrolled in an employer-sponsored LTD plan. (See Ex. B. at 1080.) On July 22, 2005, however, Plaintiff stopped working at CSC due to her mental and physical condition. (See id.) Shortly thereafter, Plaintiff applied for LTD benefits under the plan. (See id.)

In her initial application for LTD benefits, Plaintiff submitted an Attending Physician Statement from Dr. Richard B. Rosse, her treating psychiatrist, in which Dr. Rosse noted Plaintiff's history of major depression and chronic fatigue syndrome and opined that Plaintiff was unable to return to work due to her "lack of energy, overwhelming depression and easy fatigability." (Id.) Plaintiff also participated in a claimant interview with Defendant, in which

---

claimant was eligible for benefits and, if so, the nature and extent of such benefits. The reinsurance agreement effectively transferred all of Continental's rights and liabilities under the plan to CNA, rendering it a *de facto* successor-in-interest of Continental. In 2003, Hartford Life, Inc., and Hartford Life and Accident Insurance Company (collectively "Hartford Inc.") purchased CNA (and this policy) from Continental. As a result, Hartford became the second successor-in-interest of Continental. On December 31, 2003, CNA Group Life Insurance Company changed its name to Hartford Life Group Insurance Company. On December 31, 2006, Hartford Life Group Insurance Company merged with Hartford Life and Accident Insurance Company, with Hartford Life and Accident Insurance Company being the surviving entity.

Plaintiff complained of daytime sleepiness, non-restorative sleep, pain, shortness of breath, no energy, and inability to concentrate.  (See id. at 53.)  Given Plaintiff's symptoms, Defendant conducted a Physical Demands Analysis ("PDA"), which revealed that Plaintiff's job required her to work eight hours per day, five days a week, with flexible break and lunch periods.  (See id. at 1055.)  According to the PDA, Plaintiff's job required her to: use a computer and telephone; walk for thirty minutes, stand for thirty minutes, and sit one hour at a time for a total of seven hours per day; periodically lift 5-10 pounds; constantly use her fingers; frequently twist her head; and occasionally reach, twist her back, and bend her wrist.  (See id.)

After reviewing Plaintiff's application for benefits, Defendant concluded that Plaintiff qualified for LTD benefits under the "Mental/Nervous" provision of the plan, effective August 19, 2005.  (See id. at 245-46).  Importantly, however, the "Mental/Nervous" provision of the plan limited benefits to a maximum of twenty-four months.  (See id. at 11.)  Defendant subsequently provided Plaintiff with benefits for the full twenty-four months allowed under the plan, based primarily on Dr. Rosse's updated office visit notes.  (See id. at 81-82.)

B.  *Defendant Extends Benefits Due To Plaintiff's Physical Condition*

In March 2007, Defendant began reviewing Plaintiff's medical records to determine if she qualified for LTD benefits beyond the twenty-four month limitation period.  (See id. at 094.)  Specifically, the plan provided for continued benefits if Plaintiff suffered from a physical condition that caused her to be "continuously unable to engage in any occupation for which [she is] or [can] become qualified by education, training, or experience" (hereinafter "any occupation" provision).  (Id. at 8.)  Ultimately, Defendant concluded that Plaintiff suffered from a physical disability under the plan, and Defendant continued to award benefits.

Plaintiff's medical records primarily indicated that she was suffering from fibromyalgia and cervical degenerative disc disease. (See id. at 107, 783.) At all times relevant hereto, Plaintiff was under the care of Dr. Owusu-Yaw, a neurologist, and Dr. Cohen, a spine surgeon. (See id. at 800.) In a letter dated July 12, 2007, Dr. Cohen opined that Plaintiff was unable to function at a primarily sedentary level due to symptoms related to her cervical degenerative disc disease. (See id. at 107, 783). Dr. Cohen noted that a cervical laminectomy with fusion procedure was planned, and that Plaintiff would be able to function at a sedentary level twelve weeks after surgery. (See id. at 783). Based on this information, Defendant approved Plaintiff's claim for continued LTD benefits under the "any occupation" provision on July 31, 2007, due to Plaintiff's physical condition. (See id. at 108). The next day, Dr. Owusu-Yaw also submitted his assessment, in which Dr. Owusu-Yaw concluded that Plaintiff was physically impaired from performing sedentary work due to her fibromyalgia and chronic fatigue syndrome. (See id. at 109-10, 753-66).

From December 2007 to September 2008, Defendant continued to follow up with both Plaintiff and her treating physicians, periodically conducting "Milestone Calls" with Plaintiff and requesting physician assessments. During this time, Plaintiff underwent the cervical fusion surgery and reported experiencing some post-operative pain in her spine and shoulder. (See id. at 111.) Plaintiff noted, however, that her overall pain level improved following the surgery. (See id. at 117-19, 728). On September 4, 2008, Defendant conducted a "Milestone Call" with Plaintiff in which she reported that her condition had not changed. (See id. at 120-21.) At this point, however, Defendant began to question the veracity of Plaintiff's statements. While Defendant approved continued benefits, Defendant referred Plaintiff's file to the Special Investigation Unit ("SIU"). (See id. at 699). According to Defendant's records, Defendant

believed that Plaintiff's symptoms were excessive in light of her medical history. (See id.) It is not clear from the record, however, why Defendant became suspicious of Plaintiff's reported symptoms at that time. Regardless, the SIU accepted the referral and conducted video surveillance of Plaintiff in September and November 2008. (See id. 121, 523). Ultimately, the SIU concluded that Plaintiff's activity levels were consistent with the information she provided, and the SIU closed its investigation on November 19, 2008. (See id. at 124, 523).

*C.   Defendant Conducts Independent Medical Review and Denies Benefits*

In March 2009, Defendant began receiving updated physician assessments, which Defendant (presumably) interpreted as showing signs of improvement. While Dr. Owusu-Yaw continued to state that Plaintiff suffered from fibromyalgia, depression, arthritis, and multi-level disc disease, he noted that Plaintiff could sit for one hour at a time for up to eight hours a day, and concluded that Plaintiff could stand/walk for fifteen minutes at a time for up to an hour a day. (See id. at 594-95.) Defendant also received updated information from Dr. Cohen, who noted that Plaintiff still suffered from cervical degenerative disc disease but opined that Plaintiff had no restrictions on driving, reaching, fingering/handling, and could alternate between sitting and standing every 30 minutes. (See id. at 593). Following receipt of these reports, Defendant conducted a "Milestone Call" with Plaintiff on June 16, 2009, in which she reported that she was "starting to feel better." (Id. at 130-32.) In fact, Plaintiff stated that she had been exercising three to four times a week and walking about one mile every day. (See id.)

After receiving this information, Defendant referred Plaintiff's file to Nurse Rowena N. Buckley, a nurse medical care manager, to review whether the medical records continued to support a physical functional impairment. (See id. at 137.) After reviewing the file, Nurse Buckley suggested that Defendant refer the case for an independent medical assessment. (See

id.)  In September 2009, Defendant referred Plaintiff's case to Reliable Review Services, which, in turn, retained Dr. Dayton Dennis Payne, a Board-certified physician in internal medicine and rheumatology, to review the file.  (See id. at 140, 641-48.)

As part of his review, Dr. Payne analyzed Plaintiff's medical reports and conducted a peer-to-peer discussion with Dr. Owusu-Yaw, Plaintiff's neurologist.  (See id. at 643.)  Of note, however, Dr. Payne never spoke with Plaintiff regarding her medical history or then-present symptoms.  (See id. at 2283.)  In his report, Dr. Payne agreed that Plaintiff suffered from fibromyalgia, osteoarthritis, and degenerative disc disease of the spine.  (See id. 643.)  Dr. Payne opined, however, that Plaintiff's self-report complaints were "somewhat excessive" in light of her physical condition.  (See id.)  Ultimately, Dr. Payne concluded that Plaintiff was physically able to perform full-time work with no restrictions on her ability to sit, stand, walk, reach, finger, or use a computer keyboard.  (See id.)  Dr. Payne did caution, however, that Plaintiff was restricted to lifting/carrying no more than twenty pounds due to her spine disease.  (See id.)

Defendant then performed an Employability Analysis ("EA") to determine whether Plaintiff's residual functional capacity and educational level were commensurate with available occupations in the national economy.  (See id. at 141-42.)  The analysis concluded that Plaintiff qualified for two positions in the national economy: Computer Security Coordinator and/or Computer Security Specialist.  (See id. at 1494-1504.)  Defendant then compared those qualifying positions with labor market data, finding two employers in Plaintiff's region with computer security positions that met Plaintiff's physical restrictions and wage requirements. (See id. 1492-95.)  Accordingly, Defendant concluded that Plaintiff was no longer disabled under the "any occupation" provision in the plan and stopped providing Plaintiff with LTD benefits on January 30, 2010.  (See id. at 191.)

*D. Plaintiff Appeals Defendant's Adverse Benefit Determination*

On September 30, 2010, Plaintiff instituted an appeal of Defendant's adverse benefit determination. (See id. at 1130-2386.) During the appeal process, Plaintiff argued that Defendant erred because: 1) Plaintiff's condition had not improved; 2) Defendant had improperly relied on Dr. Payne's opinions to the exclusion of her own physicians' opinions; and 3) Defendant improperly relied on a vocational assessment based on Dr. Payne's improper conclusions about her residual functional capacity. (See id.)

1. Plaintiff Submits Additional Evidence Supporting Benefits

To support her appeal, Plaintiff provided additional information to Defendant. Specifically, Plaintiff submitted a written narrative in which Plaintiff described her medical history and then-present symptoms. (See id. at 2282.) Plaintiff lamented that:

> Today, my life is very different . . . I am no longer able to do the same daily activities as before the onset of pain and fatigue . . . . The surgery did not relieve my pain . . . I have stabbing and burning pain and stiffness from [the] base of my neck to my mid-back. I have burning neck pain radiating down both shoulders into my left arm . . . . I have thoracic pain that causes constant shoulder blade pain as well as pain across the right side of my chest causing soreness, shooting, burning and stabbing pain.

(Id. at 2283.) Plaintiff also attached a written statement from her son, who echoed that his mother had "changed dramatically." (Id. at 2289.) Further, Plaintiff highlighted that the Social Security Administration had found her testimony credible and approved her application for disability benefits on October 29, 2009, due to "fibromyalgia, cervical stenosis and myelopathy status post anterior cervical discectomy and fusion." (Id. at 1564, 1582, 2283.)

Dr. Owusu-Yaw also submitted a report supporting Plaintiff's appeal. Specifically, Dr. Owusu-Yaw opined that Plaintiff was "permanently disabled on account of her chronic pain syndrome" and was "unemployable on account of [various] restrictions." (Id. at 2282.) Plaintiff

also retained Andrew J. Pasternak, a certified rehabilitation counselor, who performed a vocational assessment in support of her appeal. (See id. at 2377-86.) Based on a review of the medical records and an in-person assessment, Mr. Pasternak concluded that Plaintiff was unemployable for any job, including her prior occupation. (See id. 2386.) Specifically, Mr. Pasternak stated, "We have a now 45 year old Armed Forces veteran who by nature of her injuries and multiple conditions with their on-going effects, coupled with other factors, has in my opinion been rendered incapable of any vocational capability, much less related to her former occupation." (Id. at 2386.) Similar to Plaintiff, Mr. Pasternak again directed Defendant's attention to the SSA's favorable benefits determination. (See id.)

   2.  Appeals Examiner Orders New Independent Evaluation

Appeal Specialist Juan M. Mendez conducted Plaintiff's appeal. (See id. at 182.) After reviewing the file, Mr. Mendez felt that he could not properly rely on Dr. Payne's independent evaluation, as Plaintiff was purportedly suffering from multiple conditions. (See id. at 166.) As a result, Mr. Mendez referred the case for an independent co-morbid medical record peer review, which was conducted by Dr. Paul Howard, a Board-certified physician in both internal medicine and rheumatology. (See id. at 166, 2469-70.) After reviewing Plaintiff's medical records and corresponding with Dr. Owusu-Yaw,[2] Dr. Howard "fully agreed" that Plaintiff suffered from fibromyalgia; however, Dr. Howard concluded that there was "no objective evidence [to] support [the conclusion] that fibromyalgia [was] resulting in functioning impairment." (Id. at 2389.) In a letter directly to Dr. Howard, Dr. Owusu-Yaw stood by his position that Plaintiff was functionally impaired. Dr. Owusu-Yaw opined that Plaintiff's functional impairment was

---

[2] From the record, it appears that communication between Dr. Howard and Dr. Owusu-Yaw was somewhat strained; the doctors only communicated through written correspondence. In fact, Dr. Howard completed his initial report without first corresponding with Dr. Owusu-Yaw, but Dr. Howard ultimately responded to Dr. Owusu-Yaw's written objections to the report by incorporating an addendum specifically addressed Dr. Owusu-Yaw's objections.

evidenced by: 1) weakness in upper/lower extremities that led to spine surgery; 2) fibromyalgia based on his clinical examination; 3) abnormal MRI of her cervical spine; and 4) EMG test results. See id. at 2392.

### 3. Appeals Examiner Upholds Initial Benefits Determination

After reviewing the entire medical file, including Dr. Howard's evaluation, Mr. Mendez ultimately determined that Defendant's initial decision to terminate benefits was supported by substantial evidence. (See id. at 174-78.) As such, Mr. Mendez upheld Defendant's determination. In a five-page letter to Plaintiff, Defendant described its review of the decision, specifically addressing Dr. Howard's evaluation, Dr. Owusu-Yaw's medical opinion, and the SSA's different definition of "disability." (See id. at 175.) Defendant then closed Plaintiff's file and advised her of her rights to seek review in this Court under ERISA. (See id.)

## II.    PROCEDURAL HISTORY

Plaintiff originally filed this action on August 26, 2011, in the United States District Court for the Southern District of New York, seeking reinstatement of her long-term disability benefits from Defendant. (See Compl. [ECF No. 1].) The case, however, was transferred from the Southern District of New York on Defendant's Motion to Transfer Venue. (See Def.'s Mot. to Trans. Venue [ECF No. 15].) This court acquired jurisdiction over the case on January 9, 2012. On November 30, 2012, Defendant filed a Motion for Summary Judgement (See Def.'s Mot. for Summ. J. [ECF No. 51].) Plaintiff filed its Response in Opposition on January 31, 2013. (See Pl.'s Br. in Opp. [ECF No. 60].) Defendant filed its Reply in Support of Summary Judgment on February 14, 2012. (See Def.'s Reply in Supp. [ECF No. 65].)

### III.    LEGAL STANDARD

The present action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  ERISA allows plan participants to institute a civil proceeding to recover benefits from, enforce the terms of, and clarify their future rights under a welfare benefit plan.  See 29 U.S.C. § 1132(a)(3) (2012).  When a plaintiff challenges the denial of benefits, the court reviews the denial "under a *de novo* standard of review unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility of benefits or to construe the terms of the plan."  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989).  When the plan confers discretion on the plan administrator, the court will only overturn the administrator if the denial constitutes an abuse of discretion.  See Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000).  Therefore, the court "will not disturb the administrator's decision so long as it is objectively reasonable, even if the court would have reached a different conclusion." Winebarger v. Liberty Life Assurance Co. of Boston, 571 F. Supp. 2d 719, 722 (W.D.Va. 2008); see also Champion v. Black and Decker Inc., 550 F.3d 353, 359 (4th Cir. 2008).  An administrator's decision will be considered reasonable if it is 'the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'"  Winebarger, 571 F. Supp. 2d at 722 (quoting Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997)).  "'Substantial evidence' in support of a plan decision is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' being 'more than a mere scintilla', but 'less than the weight of the evidence.'"  Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971); Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  The Fourth Circuit has set forth a non-exhaustive list of factors to consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the

> decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d. at 342-43. Ultimately, the decision must "adhere both to the text of ERISA and the plan," "rest on good evidence and sound reasoning," and "result from a fair searching process." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 323 (4th Cir. 2008) (internal citations and quotations omitted). When this threshold is met, the plan administrator's determination should be affirmed.[3]

## IV. DISCUSSION

### A. Standard of Review

The parties dispute the appropriate standard of review in this case. Resolving the appropriate standard of review turns, in part, on Judge Rakoff's decision issued prior to transferring the case. See Joyner v. Continental Cas. Co., 837 F. Supp. 2d 233, 237 (S.D.N.Y. 2011). Specifically, Judge Rakoff decided several pertinent issues related to the applicable standard of review. First, Judge Rakoff held that Continental, the plan's original insurer, was a proper fiduciary named in the plan. Id. at 237. Second, Judge Rakoff held that the plan language vested Continental with the discretionary power to administer the plan. Id. Third, Judge Rakoff held that Continental's discretion under the plan transferred to Hartford when Hartford purchased

---

[3] Because this is a summary judgment motion, I still follow the familiar Rule 56 standard of review, granting summary judgment only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); George & Co. LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009). At this stage, the facts are viewed in the light most favorable to the non-moving party. Importantly, however, it has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues are primarily legal rather than factual" in nature. Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

Continental's group insurance business, ultimately concluding that Hartford was a successor-in-interest to Continental.  Id. at 238; see also Schnur v. CTC Comms. Corp. Group Disability Plan, No. 05-cv-3297, 2010 WL 1253481 (S.D.N.Y. Mar. 29, 2010), aff'd 413 Fed. Appx. 337 (2nd Cir. 2011); Simoma v. Hartford Ins. Co., 606 F. Supp. 2d 1091, 1096 (C.D. Cal. 2009); Williams v. Hartford Life and Acc. Ins. Co., 2009 WL 3127761, *8 (S.D. Ohio Sept. 25, 2009); Barnes v. Hartford Life and Acc. Ins. Co., 2008 WL 4298466, *2 n.1 (E.D. Mich. Sept. 18, 2008). Accordingly, Judge Rakoff held that Hartford's decisions were properly reviewed under the "abuse of discretion" standard.  Joyner, 237 F. Supp. 2d at 238.

While Judge Rakoff's decision would normally resolve this issue, Judge Rakoff expressly reserved ruling on whether Hartford was properly named in the plan instrument as required by ERISA.  See Joyner, 837 F. Supp. 2d at 240 ("[E]ven though Hartford is a fiduciary for ERISA purposes, the Court cannot yet determine that Hartford is "named in the plan instrument" as ERISA requires.");  see also 29 U.S.C. § 1102(a)(2).  As such, Judge Rakoff left open the question whether the plan remained valid after Hartford purchased Continental's insurance business.  See Joyner, 837 F. Supp. 2d at 240, n.2.  Plaintiff takes this open window to argue that the plan is invalid under ERISA.  Specifically, Plaintiff argues that she is entitled to a *de novo* review because: (1) a plan was never established due to the plan sponsor's failure to sign the plan documents; and/or (2) the plan was void because Hartford is not expressly named in the plan document.  Plaintiff's arguments are addressed in turn.

### 1.  The Plan Sponsor's Failure to Sign the Plan Documents

It is undisputed that the plan sponsor (here, Plaintiff's former employer) failed to sign the plan certificate.  Accordingly, the first issue is whether the plan sponsor's failure to sign the plan documents prevented the formation of a valid employee benefits plan under ERISA.  This

determination is a question of law properly resolved on a motion for summary judgment.  See Custer v. Pan American Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993).

a. Section 1102(a) Does Not Require A Plan Sponsor To Sign the Plan Documents

It is a well settled principle that "the starting point for any issue of statutory interpretation. . . is the language of the statue itself."  In re: Maharaj, 681 F.3d 558, 568 (4th Cir. 2012) (citing United States v. Bly, 510 F.3d 453, 460 (4th Cir. 2007)).  "If the statute is unambiguous . . . we need not inquire further."  In re: Maharaj, 681 F.3d at 568 (quoting Kennedy v. St Joseph's Ministries, Inc., 657 F.3d 189, 191 (4th Cir 2011)).  The appropriate analysis here turns on an interpretation of 29 U.S.C. § 1102, which sets forth the requirements to form a valid plan under ERISA.  Specifically, § 1102(a) provides, in pertinent part, that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument."  29 U.S.C. § 1102(a).  From the statutory language, it is clear that Congress did not include a signature requirement.

There is nothing to suggest that Congress' use of "pursuant to a written instrument" implied a signature requirement.  The purpose behind § 1102(a) bolsters that conclusion.  As noted by the Eighth Circuit, "the 'written instrument' requirement is intended to ensure that participants are on notice of the benefits to which they are entitled and their own obligations under the plan.  In addition, a written instrument provides guidelines, that likewise are known to the participants, for the plan administrator as he makes coverage decisions."  Wilson v. Moog Automotive, Inc., Pension Plan and Trust for U.A.Q. Employees, 193 F.3d 1004, 1008 (8th Cir. 1999); see also Biggs v. Wittek Industries, Inc., 4 F.3d 291, 295 (4th Cir. 1993) ("A written plan is critical to ERISA's goal that employees be informed about the benefits to which they are entitled.  Oral or informal amendments . . . would undermine uncertainty.")  Because a signature

requirement would not further Congress' stated purpose, I find that a long term disability plan can be established even when the plan sponsor fails to sign the plan documents.[4]

While Plaintiff cites to <u>CIGNA Corp. v. Amara</u>, 131 S.Ct. 1866 (2012), Plaintiff's reading of <u>Amara</u> is unpersuasive. Specifically, Plaintiff cites the Court's discussion in which the Court stated that, "The plan's sponsor (*e.g.,* the employer), like a trust's settlor, creates the basic terms and conditions of the plan, *executes a written instrument* containing those terms and conditions, and provides in that instrument a procedure for making amendments." <u>Amara</u>, 131 S.Ct. at 1878 (emphasis added). Accordingly, Plaintiff argues that the Court's held that a plan sponsor must sign the plan documents in order to create a valid plan. I do not agree.

The Court's discussion in <u>Amara</u> was made in a different context than the question present in this case. The Court was not determining the requirements necessary to form a valid employee benefit plan. Rather, the Court was determining whether "terms" in a summary plan description were subject to enforcement under § 502(a)(1)(B). From the opinion, it is clear that the Court's observation that a plan sponsor "executes a written document" is best viewed as a description of the plan sponsor's normal practices as opposed to an interpretation of § 1102(a). In fact, § 1102(a) the does not contain the word "execute" at all. As such, I do not read <u>Amara</u> to place an affirmative duty on a plan sponsor to sign the plan documents. To hold otherwise, I would be reading <u>Amara</u> far beyond its intended scope. <u>See id.</u> at 1882 (Scalia, J., concurring) ("I agree with the Court that § 502(a)(1)(B) . . . does not authorize relief for misrepresentations in a summary plan description . . . . I see no need and no justification for saying anything more than that.")

---

[4] In fact, some courts have held that a particular plan complied with § 1102(a) without a formal written plan. <u>See e.g.</u>, <u>Thomas v. Burlington Industries, Inc.</u>, 763 F. Supp. 1570, 1574 (S.D. Fla. 1992).

### b. A Valid Plan Was Formed Despite The Plan Sponsor's Failure to Sign the Documents

While § 1102(a) does not require the plan sponsor to sign the plan document, I must still determine whether the parties established a valid ERISA plan. ERISA defines a valid employee welfare benefit plan as: (1) a plan, fund or program, (2) established or maintained (3) by an employer, employee organization, or both, (4) for the purpose of providing a benefit, (5) to employees or their beneficiaries. See Custer, 12 F.3d at 417; see also 29 U.S.C. § 1002. In determining whether a plan exists, courts have employed a functional analysis. Specifically, "[t]here must be some payment and manifestation of intent by the employer or employee organization to provide a benefit to the employees[,]" and "[t]he existence of a plan may be determined from the surrounding circumstances to the extent that a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." Custer, 12 F.3d at 417 (citing Donovan v. Dillingham, 688 F.2 1367, 1373 (11th Cir. 1982) (en banc)).

Here, the plan clearly meets the standard set forth in Custer. The plan certificate sufficiently identifies: (1) the benefits under the plan as long term disability benefits; (2) the intended beneficiaries as participants enrolled in the plan; (3) the source of funding as premiums paid to Hartford under the terms of the plan; and (4) the procedure for participants to apply for plan benefits. (See Def.'s Br., Ex. 1, pg. 1-26). Moreover, the plan certificate manifests a clear intention by CSC and Defendant to establish and maintain an employee benefit plan. (See Ex. 1, pg. 1) ("We agree with the employer to insure certain eligible employees of the Employer. We promise to pay benefits for loss covered by the policy in accordance with its provisions.").

Furthermore, Plaintiff's actions evidence that "a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits."

<u>Custer</u>, 12 F.3d at 417. Plaintiff signed up for this plan through her employer; she paid premiums for the plan; she applied for <u>and</u> received long-term disability benefits under the plan; and she carried her claim through the appeals process outlined in the plan. <u>Accord</u> <u>Madonia v. Blue Cross & Blue Shield of Va.</u>, 11 F.3d 444, 447 ("[P]ayment of premiums . . . is substantial evidence that a plan, fund or program was established." (internal citations and quotations omitted)). In fact, Plaintiff instituted this present action under § 502(a)(1)(B) of ERISA, specifically alleging that she "was a plan participant and beneficiary under a Computer Sciences Corporation long-term disability plan, underwritten and administered by Continental Casualty Company." (<u>See</u> Pl.'s Br. at 9). Plaintiff's argument, on the eve of trial, that no plan was ever established is disingenuous, essentially asking me to disregard the detailed plan documents and Plaintiff's own actions. Accordingly, I find that the parties formed a valid and enforceable ERISA plan.

### 2. Failure to Expressly Name Hartford In the Plan Did Not Invalidate the Plan

Next, I must determine whether the plan remained valid after its transfer to Hartford. Specifically, I must determine whether the plan was invalidated because Hartford was not named in the plan as required by 29 U.S.C. § 1102. Section 1102(a)(1) provides that, "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).[5]

---

[5] It is important to clarify that § 1102(a) does not require the plan to state that Hartford was a fiduciary. Instead, § 1102(a) only requires that a fiduciary (<i>i.e.</i>, Hartford) be named in the plan. <u>See</u> <u>Joyner</u>, 837 F. Supp. 2d at 237.

Before turning to the analysis, it is important to clarify the plan's history. First, it is clear that the plan was valid at its inception. At that time, the plan complied with the express provisions of § 1102(a) because Continental was a fiduciary who was also "named" in the plan documents. See Joyner, 837 F.Supp.2d at 235. Specifically, the Group Long Term Disability Certificate clearly stated that, "[w]hen making a benefit determination under the policy, we have discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (See Def.'s Br., Ex. 1, pg. 1-26.) "We" in the Certificate was defined by the contract to mean the "Continental Casualty Company, Chicago, Illinois." (Id.) Shortly thereafter, Continental entered into the reinsurance agreement with CNA, which provided that CNA would administer the plan. When Continental and CNA entered into the reinsurance agreement, however, the plan was never amended to reference CNA. Then, in 2003, Hartford purchased Continental's insurance business, including this plan. When Hartford purchased Continental's insurance business, Hartford executed an endorsement to inform plan participants that Hartford was the new plan administrator. The endorsement, however, was flawed. The endorsement purported to amend all references of CNA to Hartford; the plan, however, did not contain any references to CNA —it had always defined "we" as Continental. As such, it is clear that Hartford was never "named" in the plan.

Because the plan was initially valid under ERISA, the precise issue here is whether Hartford's failure to amend the plan invalidated an otherwise valid plan. While it is clear that Hartford's endorsement was flawed, Hartford's efforts to inform plan participants of the change in their plan administrator align with the purpose behind § 1102(a)(1). Specifically, the purpose of § 1102(a)(1) is to ensure "that responsibility for managing and operating the plan—and

liability for mismanagement—are focused with a degree of certainty." See Birmingham v. So-Gen-Swiss Inter. Corp. Retirement Plan, 718 F.2d 515, 522 (2nd Cir. 1983).

Here, Hartford's status as plan administrator was focused with a degree of certainty. Foremost, Plaintiff directed all of her contact toward Hartford, dealing exclusively with Hartford from her initial claims application through the appeals process. It appears that neither Plaintiff nor her counsel on appeal ever questioned whether Hartford was the plan administrator. At the same time, Harford acted as plan administrator: Hartford received and processed Plaintiff's initial application for benefits; Hartford paid Plaintiff's benefits for five years; Hartford conducted an appeals process of its initial adverse benefits determination; and Hartford is even defending this present lawsuit (despite not being a named party). In light of § 1102(a)'s overall purpose, I find that Hartford's *per se* violation of § 1102 did not invalidate the plan. To hold otherwise, I would be elevating form over substance.[6]

### 3. The "Abuse of Discretion" Standard Applies

Because the plan remained valid after Hartford purchased the plan, Hartford's decisions are reviewed under the "abuse of discretion" standard. As Judge Rakoff concluded, Hartford is a fiduciary under the plan and is vested with discretionary authority to administer the plan. See Joyner, 833 F.3d at 233; see also Hall v. Tyco Intern. Ltd., 223 F.R.D. 219, 234 (M.D.N.C.

---

[6] While not presented with this issue directly, other courts have reconciled violations of § 1102 without finding the plans invalid. For example, the Eastern District of New York, in Solis v. J.P. Maguire Co., Inc. Salary Sav. Plan, No. 11-CV-2904, 2012 WL 4060569 (E.D.N.Y. July 24, 2012), found that the plan fell out of compliance with 29 U.S.C. § 1102 when the previously (and only) named plan administrator was convicted of a federal crime and was precluded from administering the plan. See id. Instead of holding that the plan was invalid under ERISA, the court employed its equitable powers to bring a plan into compliance with § 1102 by appointing an independent fiduciary to administer the plan. See id. Moreover, in Murphy v. Keystone, the Central District of Illinois held that the plan's violation of § 1102 did not warrant any substantive remedy. Murphy, 850 F. Supp. 1367, 1383 (C.D. Ill. 1994) (holding that the plaintiff did not show "any detrimental reliance warranting a substantive remedy under ERISA.") Instead, it reasoned that, "[t]hat is not to say that Plaintiffs cannot force [Defendant] to bring its plan into conformity with ERISA requirements in that regard," implying that some sort of equitable relief was more appropriate. Murphy, 850 F. Supp. at 1383.

2004) ("Even if the plan does not name an entity as a fiduciary, that entity may still qualify as a fiduciary under ERISA because ERISA extends the scope of the term fiduciary to any person or entity who actually exercises discretionary authority, control, or responsibility over the plan."). The failure to expressly name Hartford in the plan does not change that conclusion. See Winker v. Metro. Life Ins. Co., 340 F. Supp. 2d 411 (S.D.N.Y. 2004) (holding that the defendant was a fiduciary subject to the abuse of discretion standard even though it was not expressly named as a fiduciary in the plan).[7]   As such, I will review Defendant's benefits determination under the "abuse of discretion" standard.

### B. Defendant's Benefits Determination Was Reasonable

In reviewing an ERISA adverse benefit determination under the "abuse of discretion" standard, the district court should "not disturb an ERISA administrator's discretionary decision if it is reasonable." Evans, 514 F.3d at 321-22.  A decision is reasonable so long as it is the product of a "deliberate, principled reasoning process and if it is supported by substantial medical evidence." Id. at 322.

Under the terms of her plan, Plaintiff could receive benefits for twenty-four months if Plaintiff could demonstrate that she was unable "to perform the [m]aterial and [s]ubstantial duties of [her] [r]egular [o]ccupation."  (See Def.'s Br., Ex. 1 pg 8.)  After the initial twenty-four months period, however, Plaintiff needed to show that she was "continuously unable to engage in any occupation for which [she] was or [could] become qualified by education, training or experience."   (See id.)  Because Plaintiff exhausted her benefits under the twenty-four month provision, this case turns on an interpretation of the "any occupation" provision.

---

[7] Plaintiff also argues that, to the extent that there is a valid plan, Hartford lacked authority to act on behalf of the plan because Hartford was not named in the plan as a claims administrator nor did it obtain any written authority to act in that capacity. Judge Rakoff adequately resolved this issue in Defendant's favor; I find no reason to revisit his conclusion. See Joyner, 837 F. Supp. 2d at 237 (collecting cases).

### 1. Defendant Engaged in a Deliberate, Principled Reasoning Process

The extensive record in this case demonstrates that Defendant arrived at the benefits determination through a deliberate and principled reasoning process.[8] From the record, it is clear that Defendant undertook a thorough review of Plaintiff's claim and provided Plaintiff with a full explanation why Defendant found Plaintiff's medical evidence unpersuasive. See, e.g., Booth v. Wal-Mart Stores Inc. Associates Heath & Welfare Plan, 201 F.3d 335, 344-45 (4th Cir. 2000).

As detailed in the administrative record, Defendant engaged in a thorough review of Plaintiff's claim for nearly two years, from September 2008 until January 2010. Starting in September 2008, Defendant began receiving reports that Plaintiff was showing signs of improvement. As a result, Defendant began to investigate whether Plaintiff still qualified for benefits under the plan. During that review, Defendant: reviewed updated office visit notes from all of Plaintiff's treating physicians; obtained functionality assessment from Plaintiff's treating physicians; conducted video surveillance of Plaintiff's mobility; performed an employability analysis and labor market survey through an independent vendor, which identified two occupations in Plaintiff's geographic region for which she qualified;[9] and obtained an

---

[8] Plaintiff also argues that Defendant failed to provide her with a "full and fair review" under 29 U.S.C. § 1133 because Hartford—the reviewer—was not a "named fiduciary." See 29 U.S.C. § 1133 ("[E]very employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim has been denied for a full and fair review by the appropriate *named fiduciary* of the decision denying the claim.") (emphasis added). Because Plaintiff was provided a "full and fair" review, as discussed infra, her contentions would, at most, amount to a procedural violation of § 1133, which would only entitle Plaintiff to a remand. See Fischman v. Blue Cross & Blue Shield of Connecticut, Inc., 775 F. Supp. 513, 517 (D. Conn. 1991). In this case, however, remand would be futile and unnecessary. See Krauss v. Oxfrod Health Plans, Inc., 517 F.3d 614, 630 (8th Cir. 2008) (holding that an administrative remand is not required where it would be a "useless formality"). This violation would not, as argued by Plaintiff, entitled her to a *de novo* review of Hartford's decision. See, e.g., Fischman, 775 F. Supp. at 516; see also Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 159 (4th Cir. 1993).

[9] Plaintiff argues that the employability analysis was flawed because the analysis did not confirm that the two jobs were actually available to Plaintiff. Specifically, Plaintiff argues that these positions were already filled. This contention is wholly unsupported by the plan or by relevant case law. Plaintiff's argument that Defendant needed to actually ensure she had the opportunity to apply for the jobs transforms her disability benefits into unemployment insurance. Defendant was only required to identify that a potential position existed in the local economy; Defendant did not need to continue to provide benefits until one of those positions became available.

independent medical record peer review opinion from Dr. Payne, who prepared a detailed report in which he opined that Plaintiff was capable of performing full-time sedentary work. Weighing all of the evidence, Defendant determined that Plaintiff was no longer disabled under the terms of the plan.

Defendant then undertook an extensive appeal process, where Defendant obtained an additional, independent, co-morbid medical record peer review opinion from Dr. Howard, who reviewed all of Plaintiff's medical records, including those submitted on appeal. From the record, it is clear that Dr. Howard corresponded with Plaintiff's physicians and considered their medical opinions. In fact, Dr. Howard prepared a separate addendum specifically addressing Dr. Owusu-Yaw's contrary opinions. After reviewing Plaintiff's medical reports, Dr. Howard agreed that Plaintiff suffered from fibromyalgia; he, nevertheless, concluded that there were no objective findings to support any physical restrictions that prevented Plaintiff from performing full-time work in a sedentary occupation.[10]

Aside from Dr. Howard's opinions, Defendant considered the SSA's decision, a written narrative from Plaintiff and her son, Plaintiff's vocational report, and Plaintiff's treating physicians' medical opinions. After weighing all the medical and non-medical evidence, Defendant ultimately affirmed its initial decision. Defendant then sent Plaintiff a five-page letter detailing their appellate review of the decision, specifically addressing Dr. Howard's evaluation, Dr. Owusu-Yaw's medical opinion, the SSA's different definition of "disability," Plaintiff's vocational report, and the personal narratives submitted on her behalf. As such, there is nothing

---

Plaintiff's inability to find a job does not mean that she is unable to perform one. The former is a risk she takes; the latter is the risk she insured against.

[10] Plaintiff argues that Dr. Howard's evaluation was flawed because Dr. Howard did not consider Mr. Pasternak's vocational report. Plaintiff, however, mischaracterizes the relevant inquiry. It is not important for Dr. Howard—a medical profession—to review a non-medical professional's non-medical opinion. Rather, it is Defendant's duty to evaluate the report alongside any other medical or non-medical information, which Defendant did.

to suggest that Defendant "[either] ignored evidence supportive of Plaintiff's alleged total disability [or] distorted statements made by any of the physicians." Piepenhagen v. Old Dominion Freight Line, Inc., 395 Fed. Appx. 950, 956 (4th Cir. 2010) (unpublished).

While Defendant ultimately sided with Dr. Howard's conclusions over the opinions of Dr. Owusu-Yaw, it was well within Defendant's province to weigh these conflicting opinions and side with Dr. Howard and Dr. Payne. See Keith v. Federal Exp. Corp. Long Term Disability Plan, No. 7:09-cv-00389, 2010 WL 1524373, *5 (W.D.Va, April 15, 2010) (quoting Elliott v. Sara Lee Corp., 190 F.3d 601, 606 (4th Cir. 1999)) (noting that "'[i]t is not an abuse of discretion for a plan fiduciary to deny disability . . . benefits where conflicting medical reports were presented.'"); Frankton v. Metropolitan Life Ins. Co., Civil No. 1:08-cv-2209, 2009 WL 3215954, *9 (D.M.d. Sept. 30, 2009) ("It is not an abuse of discretion for an administrator to adopt the reasonably formed opinion of one doctor over another.")  As stated by the Supreme Court, ERISA does not enable courts "to require administrators [to] automatically accord special weight to the opinions of a claimant's physicians; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). As such, I find that Defendant's benefits determination was reached through a deliberate and principled process.[11]

### 2. Defendant's Decision is Supported by Substantial Medical Evidence

---

[11]  I do acknowledge that Hartford's status as both insurer and plan administrator constitutes a structural conflict of interest.  The Fourth Circuit made clear in Williams v. Metropolitan Life Ins. Co., 609 F.3d 622 (4th Cir. 2010), however, that this conflict of interest should not alter my standard of review.  Williams, 609 F.3d at 630-31 (rejecting a modified abuse of discretion standard in the presence of a structural conflict).  Instead, I should view this apparent conflict as "'but one factor among many.'"  Id. at 630 (quoting Metropolitan Life Ins. Co., v. Glenn, 554 U.S. 105 (2008)).  Here, however, Plaintiff has not raised any issues related to this conflict of interest.  As such, I conclude that the effect of this conflict on decision-making process was minimal.

While I must construe the facts in the light most favorable to the non-moving party, Plaintiff bears the ultimate burden to show that she is disabled under the plan. See McKelding v. Reliance Standard Life Ins. Co., 254 Fed.Appx. 964, 968 (4th Cir. 2002). In this case, Plaintiff faces an additional hurdle because Plaintiff's claim rests on an interpretation of the plan's "any occupation" provision, an admittedly "rigorous" standard to meet. See, e.g., Donnell v. Met. Life Ins. Co., No. 04-2340, 165 Fed. Appx. 288, 292 (4th Cir. Feb. 8, 2006) (unpublished). Ultimately, Defendant's determination that Plaintiff failed to submit sufficient evidence to show that she was totally disabled from either fibromyalgia or spinal disease was supported by medical evidence.

Principally, Defendant reasonably concluded that the bulk of Plaintiff's evidence in support of her fibromyalgia claim were Plaintiff's own self-reported, subjective complaints of pain and fatigue instead of objective medical findings. For example, Dr. Owusu-Yaw's office visit notes reflect that all physical and neurological examinations showed normal functioning and that physical therapy had helped Plaintiff's symptoms. Dr. Owusu-Yaw also stated that Plaintiff had "no focal neurological deficits" that restricted or limited her functional ability. (See Def.'s Br., Ex. 1 pg. 643). In fact, the record is devoid of any objective functionality assessments supporting Plaintiff's purported inability to perform full-time sedentary work. (See id. at 593, 595, 1056). While Dr. Owusu-Yaw described Plaintiff's symptoms in his office notes, those subjective complaints do not automatically become objective medical findings when penned by a doctor; there must be some objective test showing that those symptoms resulted in functional disability.[12] While there is little doubt that Plaintiff suffered from fibromyalgia, Plaintiff failed

---

[12] Despite apparently normal neurological testing results, Dr. Owusu-Yaw opined in August 2010 that Plaintiff was "unemployable on account of restrictions in carry/lifting more than twenty pounds repetitively, and thirty pounds infrequently, bending, stooping, crouching, fingering, using a keyboard and number of hours of absenteeism anticipated from having chronic pain syndrome/fibromyalgia syndrome with chronic fatigue."

to submit any objective measurements of how Plaintiff's diagnosis interfered with her ability to perform sedentary work.

Plaintiff also failed to adduce sufficient evidence to show that she was disabled because of degenerative disc disease. While Defendant concedes that Plaintiff was initially disabled from degenerative disc disease, the evidence supports Defendant's conclusion that Plaintiff made a sufficient recovery following her spinal fusion surgery. Most persuasively, Dr. Cohen—Plaintiff's own treating physician—opined that Plaintiff would be able to perform full-time sedentary work fourteen weeks after surgery. In his attending physician statement, Dr. Cohen concluded that she had very few restrictions after surgery. He noted that Plaintiff could sit and stand while alternating every thirty minutes; that she could bend, kneel, and crouch; and frequently lift/carry up to ten pounds. (See Def.'s Br. Ex. 1, pg. 593). Moreover, he opined that Plaintiff had no restrictions on her ability to drive, reach or handle objections. (See id.) On appeal, Dr. Howard reached the same conclusion. Dr. Howard opined that Plaintiff had mild limitations from the residual symptoms of her degenerative disc disease; however, Dr. Howard concluded that these impairments did not preclude Plaintiff from obtaining employment. As such, Defendant's determination with respect to Plaintiff's disc disease was supported by substantial medical evidence.

Plaintiff, however, contends that the record contains sufficient medical evidence to show she is disabled. Specifically, Plaintiff argues that the Mr. Pasternak's vocational report shows that she is disabled. (See Pl.'s Br. pg. 15). While Defendant should have—and did—consider

---

(See id. at 2292). During the appeals process, Dr. Owusu-Yaw opined that Plaintiff's functional impairment was evidenced by: 1) weakens of her upper/lower extremities that led to spine surgery; 2) fibromyalgia based on his clinic examination; 3) abnormal MRI of her cervical spine; and 4) EMG test results. Even assuming that Dr. Owusu-Yaw's conclusions constitute objective findings of Plaintiff's *functional disability*, Defendant's contrary determination is not grounds for finding Defendant's decision unreasonable. See Keith 2010 WL 1524373, at *5.

Mr. Pasternak's report, Defendant possessed the discretion to assess Mr. Pasternak's reports in light of the other evidence in record. Ultimately, Defendant reasonably determined that Mr. Pasternak's primarily non-medical opinion did not outweigh the other reliable medical evidence. Plaintiff's argument that her personal statements evince her functional disability has a similar fate. Defendant, as a claim fiduciary, had the right to rely on the objective medical evidence in the record to the exclusion of Plaintiff's subjective complaints. See, e.g., Scott v. Eaton Corp. Long Term Dis. Plan, 454 Fed. Appx. 154, 161 (4th Cir. 2011) (upholding the administrator's decision where the subjective complaints were inconsistent with the objective medical evidence).

Finally, Plaintiff relies on the SSA's benefits decision to evidence her disability. It is well settled, however, that reaching a different conclusion from the Social Security Administration is not an abuse of discretion. See Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 275 (4th Cir. 2002). SSA determinations of disability are based on a different definition of disability and the agency employs a different standard. See Gallagher, 305 F.3d at 275. For example, SSA regulations provide that greater weight should be given to medical opinions from treating physicians. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2008) (citing to C.F.R. §§ 303.1527(d) (2), 416.927(d)(2) (2002)). Under ERISA, there is no such preference. See id. at 834. It is also worth noting that the SSA awarded Plaintiff benefits based on medical findings presented in 2009—a time in which Plaintiff was still receiving benefits under the plan. Thus, Plaintiff cannot take the SSA's decision and apply it whole cloth to Defendant's review of additional medical evidence several months later. "Because the SSA was been presented with different materials, has a different process of review and different regulations under which a determination is made, its decision is not dispositive."

<u>Gluth v. Fed. Home Loan Mortg. Corp. Long-Term Disability Plan</u>, No. 1:11-cv-1126, 2013 WL 246897, *6 (E.D. Va. Jan. 17, 2013).

Plaintiff's contentions boil down to a simple disagreement with Defendant's interpretation of the medical evidence. Plaintiff's argument, however, mischaracterizes my review of Defendant's decision. Because Defendant is vested with discretion to construe the terms of the plan, I should avoid an *ad hoc* weighing of conflicting evidence or substituting my judgment for that of the claims administrator. The plan vests Defendant with the discretion to weigh the conflicting medical evidence and to ultimately arrive at a sound decision. Here, Defendant has engaged in a reasonable and thorough process, and its ultimate decision is supported by medical evidence. While Plaintiff disagrees with Defendant's final decision, she has not pointed to any persuasive evidence to show that Defendant disregarded certain evidence or that objective medical evidence undermines Defendant's decision. As such, I **GRANT** Defendant's Motion.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**. The clerk is directed to send a copy of the Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 7th day of March, 2012.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE